# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LINDELL POINTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 12-CV-397-JED-PJC |
| v. | ) |
| | ) |
| CITY OF TULSA, JEFF HENDERSON, | ) |
| BRANDON McFADDEN, RONALD | ) |
| PALMER, JOE DOES 1-30 AND JOHN | ) |
| DOES 31-40 | ) |

## OPINION AND ORDER

Plaintiff alleges that his civil rights were violated by his arrest and subsequent imprisonment following the execution of a search warrant that was premised upon knowingly false information. He asserts claims under 42 U.S.C. § 1983 and state tort claims against the law enforcement officers who were involved, the City of Tulsa, and then-Chief of Police Ronald Palmer in his individual capacity.[1] Plaintiff also named 40 "John Doe" law enforcement officers, supervisors, or policy makers. The City and defendant Palmer have moved to dismiss on several grounds.

**I. Background**

Plaintiff's First Amended Complaint alleges the following facts, which the Court accepts as true at this stage of the litigation. In March 2008, plaintiff's residence was searched as a result of a search warrant obtained on the basis of an affidavit provided by defendant Jeff Henderson, who was a police officer in the Tulsa Police Department (TPD). In the affidavit, Henderson swore that he had been contacted by a reliable confidential informant (RCI) who reported that he

---

[1] The Court previously stayed the action only as to defendant Brandon McFadden, because he provided notice of bankruptcy. (Doc. 26). Defendant Henderson filed an Answer to the First Amended Complaint. (Doc. 32).

had, in the prior 72 hours, been to two residences and "observed two black males, known to the RCI as 'Jamon Pointer' ... and his brother only known as 'LP' who were selling cocaine out of the residences...." (Doc. 13 at ¶ 11) (quoting Henderson's affidavit). Henderson's affidavit "was a complete sham, fabrication, and was without any basis in fact or truth." (*Id.* at ¶ 14). Following execution of the warrant, plaintiff and his brother, Jamon Pointer, were separately charged by criminal indictments in this federal district court. The charges against Jamon Pointer were tried to a jury, and he was convicted on drug and weapons charges.

Plaintiff was charged with drug and weapons offenses similar to those on which his brother was convicted. It was expected that the same search warrant, similar witnesses, and similar evidence would be presented at plaintiff's trial as was admitted in his brother's trial. Plaintiff pled guilty in the hope of receiving a sentence less than he would receive if he were convicted, as his brother was following a jury trial. At the time of the plea, plaintiff "did not know that the Defendants: illegally and unlawfully entered his residence; illegally and unlawfully searched his home and property; illegally and unlawfully took possession of his personal property; illegally and unlawfully arrested and jailed him; [and] illegally and unlawfully caused a federal criminal indictment to be brought against him...." (*Id.* at ¶ 21). "Plaintiff never voluntarily and knowingly entered into a plea agreement as the evidence underlying the criminal allegations were [sic] completely fabricated and false [and] Plaintiff was never advised prior to his accepting a guilty plea of the numerous allegations of police corruption involving the very law enforcement officials involved in this case." (*Id.* at ¶ 23). Following his guilty plea, plaintiff was sentenced in January, 2009 to 168 months in prison.

Officer Henderson was subsequently indicted in July 2010 for certain acts from and after 2005. One of the counts of the indictment against Henderson alleged criminal wrongdoing in

connection with the search and seizure of plaintiff and plaintiff's brother.[2] Plaintiff was released from prison following the entry of an Order by the Honorable Terence C. Kern dismissing plaintiff's indictment, with prejudice, and vacating plaintiff's guilty plea and Judgment in November 2010.

As to his claims against the City and Palmer, plaintiff alleges that they "knew that Henderson and other TPD officers were committing perjury, suborning perjury, fabricating evidence, and initiating what would become the malicious prosecution of the Plaintiff and numerous other persons." (*Id.* at ¶ 32). Palmer "tacitly accept[ed] and encourage[d] a code of silence wherein police officers refuse[d] to report other officers' misconduct, and encourage[d] and/or fail[ed] to discipline officers who 'testilie' [sic] and fabricate evidence to initiate and continue the malicious prosecution of the Plaintiff and others." (*Id.* at ¶ 34). The City and Palmer also "knew that the Plaintiff was continuing to be being [sic] wrongfully imprisoned even after his brother Jamon Pointer had been freed. At no time did the [City or Palmer] undertake any attempt to have the Plaintiff's conviction dismissed or otherwise terminate his prison sentence. Rather, they decided to keep the Plaintiff uninformed of their police corruption, that their actions and omissions which led to the Plaintiff's arrest to begin with would continue, and that leaving the Plaintiff incarcerated was more important than reversing their own criminality." (*Id.* at 37).

Plaintiff has asserted claims under § 1983 against the City and Palmer, in his individual capacity, for deprivation of "rights secured by the Fourth, Fifth, Sixth, and Fourteenth Amendments" to the United States Constitution. Plaintiff also asserts a negligence claim against the City, and a claim for intentional infliction of emotional distress against Palmer.

---

[2] After a lengthy trial, the jury found Henderson not guilty on that count, but convicted Henderson on several other felony counts. (No. 10-CR-117, Doc. 300 at 45).

## II. Dismissal Standards

In considering a Rule 12(b)(6) dismissal motion, a court must determine whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). The Rules require "a short and plain statement of the claim to show that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The standard does "not require a heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555-56, 570 (citations omitted). "Asking for plausible grounds ... does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 562.

*Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to the claimant. *See Twombly*, 550 U.S. at 555; *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

**III. Analysis of the Dismissal Motions**

   **A.   *Allegations Supporting Policy or Custom or Supervisor Liability***

Both the City and Palmer contend that the First Amended Complaint is so lacking in factual support that it fails to state any plausible claim against the City or against Palmer in his individual capacity. As is explained below, neither the City nor Palmer may be held liable on a theory of *respondeat superior*, i.e. solely because they employed or supervised an officer who engaged in tortious or wrongful acts.

A municipality or county may not be held liable under § 1983 solely because its employees inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

To establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy or custom distinguishes the "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and

5

practices so persistent and widespread as to practically have the force of law.'" *Connick*, 131 S. Ct. at 1359.

The Tenth Circuit has described several types of actions that may constitute municipal policy.

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A supervisor may also not be held liable individually under a theory of respondeat superior. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)). "[M]ere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999). Three elements are required to establish supervisory liability: (1) personal involvement; (2) causation; and (3) state of mind. *Schneider*, 717 F.3d at 767. Although federal courts appear to uniformly agree that the Supreme Court's *Iqbal* decision imposes a stricter liability standard for the "personal involvement" element of a claim for supervisor liability, the Tenth Circuit has not yet determined the contours of that standard. *See, e.g., Booker*, 745 F.3d at 435 (noting the contours of the personal involvement requirement set forth in *Iqbal* "are still somewhat unclear after *Iqbal* ... [but] [w]e need not define those contours here..."). But the court has not overruled its post-*Iqbal* decision that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility

6

for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by the Constitution....' *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting § 1983). A plaintiff may therefore establish supervisor liability by showing that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* at 1199-1200.

Plaintiff has alleged that he was wrongly arrested based upon false information, namely, an affidavit of a TPD officer (Henderson) which "was a complete sham, fabrication, and was without any basis in fact or truth." (Doc. 13 at ¶ 14). He was arrested, indicted, and spent two years incarcerated before he was released following the dismissal of the indictment. Plaintiff further alleges that the City and Palmer both knew that Henderson and other officers were committing perjury, suborning perjury, fabricating evidence, and initiating a malicious prosecution of the plaintiff, but they accepted and encouraged such conduct and allowed it to continue, rather than acting to stop such behavior. The City and Palmer "promulgated, employed, and/or organized unlawful and illegal customs and practices of TPD officers that fabricated information about persons such as the Plaintiff resulting in: maliciously created unfounded criminal charges against the Plaintiff; falsification of evidence and filing of false police reports and evidence ...; [and] committing perjury and encouraging others to do so ...." (*Id.* at ¶ 44). The City and Palmer "willfully and intentionally refused to undertake the necessary remedial efforts to protect citizens from Henderson," "fail[ed] to adequately and properly train its officers," and "knew of the threat of harm and injury Henderson posed to the Plaintiff and the

citizens of Tulsa, and acted with deliberate indifference to the Plaintiff's constitutional rights." (*Id.* at ¶¶ 33, 45). Citing a press article, plaintiff also alleges that Palmer has said that he is partly responsible for a police culture that allowed officers to commit illegal acts.

While they are stated somewhat generally at this point, the foregoing allegations are sufficient at the pleading stage to state a plausible claim against the City for municipal liability and against Palmer for supervisor liability.

### B. *Timeliness of Fourth Amendment Claim*

Plaintiff's second cause of action asserts a § 1983 claim under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The City and Palmer argue that the Fourth Amendment claim is time-barred. "A hodgepodge of state and federal law governs the timeliness of claims" under § 1983. *Mondragón v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). "The statute of limitations is drawn from the personal-injury statute of the state in which the federal district court sits." *Id.* Federal law "determines the date on which the claim accrues and the limitations period starts to run." *Id.* State law governs tolling, although federal law may allow additional equitable tolling in rare circumstances. *Id.* In this case, plaintiff's § 1983 claims are governed by a two-year statute of limitations. *See Okla. Stat.* tit. 12, § 95(A)(3); *Price v. Philpot*, 420 F.3d 1158, 1162 (10th Cir. 2005); *Meade v. Grubbs*, 841 F.2d 1512, 1522-24 (10th Cir. 1988).

"[A] plaintiff who claims that the government has unconstitutionally imprisoned him has at least two potential constitutional claims." *Mondragón*, 519 F.3d at 1082. The Tenth Circuit has explained certain accrual differences between Fourth Amendment and Fourteenth Amendment claims of unconstitutional imprisonment, as follows:

> In summary, two claims arise from an allegedly unconstitutional imprisonment as analysis "shifts" from the Fourth Amendment to the Due Process Clause. The

8

> period of time between an unlawful arrest and the institution of legal process forms one constitutional claim, arising under the Fourth Amendment. That claim accrues when the plaintiff is released or legal process is instituted justifying that imprisonment. The period of time between the institution of that process and its favorable termination – through acquittal, habeas corpus, voluntary dismissal, etc. – forms a second claim, arising under the Due Process Clause. That claim accrues, at the earliest, when favorable termination occurs.

*Id.* at 1083 (citations omitted). For purposes of accrual of a plaintiff's Fourth Amendment unlawful arrest claim, "legal process" is instituted "when, for example, he is bound over by a magistrate or arraigned on charges." *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 127 S. Ct. 1091, 1096 (2007)). Accordingly, for purposes of plaintiff's Fourth Amendment claim for false arrest, the statute of limitations began to run, at the latest, on June 30, 2008 when plaintiff was arraigned by a magistrate judge in this federal courthouse. His initial Complaint was filed on July 18, 2012, over four years later and outside the two year statute of limitations. While, as noted, there are "rare" cases in which there may be an argument for equitable tolling, plaintiff has not provided any argument or authorities supporting equitable tolling. Accordingly, plaintiff's Fourth Amendment claim for unlawful arrest is dismissed without prejudice.

### C. Fifth Amendment Claim

The City of Tulsa and Palmer assert that plaintiff has not stated, and cannot state, a claim under the Fifth Amendment against the City and Palmer, as they are not a federal entity or agent. The Court agrees.

> The Due Process Clause of the Fifth Amendment applies only to action by the federal government while the Due Process Clause of the Fourteen Amendment applies to actions by state governments. Here, Koessel alleges conduct only done by state authorities, and thus there can be no Fifth Amendment claim. Moreover, because § 1983 imposes liability only for actions taken under state law, even if there were a federal actor involved there would be no Fifth Amendment claim under § 1983.

*Koessel v. Sublette County Sheriff's Dep't*, 717 F.3d 736, 748, n.2 (10th Cir. 2013); *Smith v. Kitchen*, 156 F.3d 1025, 1028 (10th Cir.1997) ("From the earliest interpretations of this

amendment, courts have agreed that the Fifth Amendment protects against actions by the federal government."). The Fifth Amendment claim asserted as a component of plaintiff's § 1983 claims against the City and Palmer is therefore dismissed.

Even though the Court has determined that plaintiff may not assert a § 1983 due process claim against state actors under the Fifth Amendment, plaintiff's second cause of action also asserts a Fourteenth Amendment due process claim. Defendants do not at this stage challenge the timeliness or general viability of that due process claim, and that claim would have accrued only after plaintiff was released from prison. *See Mondragón*, 519 F.3d at 1083. Because he filed this suit less than two years after his release, the Fourteenth Amendment due process claim is not untimely. Accordingly, the second cause of action cannot be dismissed entirely.

### D. *Sixth Amendment Claim*

As part of his § 1983 claim, plaintiff asserts that his rights under the Sixth Amendment to the United States Constitution were violated. Specifically, he argues that his guilty plea in the underlying criminal proceeding was not voluntary because his plea was based upon deception by Henderson and federal agent Brandon McFadden. The City and Palmer assert that plaintiff has not stated a viable Sixth Amendment claim because plaintiff waived his right to a speedy trial, and the First Amended Complaint does not include any allegations that the City or Palmer violated his right to confront witnesses. Plaintiff does not cite any on point authority supporting his claim that his Sixth Amendment rights were violated by his own plea of guilty to federal criminal charges. In addition, his complaint does not allege any involvement by the City or Palmer with respect to his plea agreement with the United States, his Rule 11 plea colloquy, or the general process utilized by the United States Attorney with respect to such pleas. The Sixth Amendment claim against the City and Palmer is dismissed.

### E. Conspiracy Claims

The City and Palmer argue that plaintiff's allegations of a systematic cover-up and conspiracy should be dismissed. They contend that "[a] civil conspiracy in the context of a civil rights cases [sic] arises under 42 U.S.C. § 1985(3)," and that plaintiff's allegations of conspiracy must be dismissed because the First Amended Complaint does not allege racial or class-based animus as required under § 1985(3). (Doc. 15 at 12). In response, plaintiff asserts that he has not attempted to set forth any such claim, and the general allegations of conspiracy merely refer to tortious and unlawful conduct by the defendants. The First Amended Complaint does not assert any claim under § 1985. (*See* Doc. 13). Accordingly, there is presently no § 1985 claim to be dismissed.[3]

### F. Tort Claims against the City

#### 1. Alleged *Respondeat Superior* Liability for Henderson's Conduct

Plaintiff's third cause of action asserts a negligence claim against the City. That claim is governed by the Oklahoma Governmental Tort Claims Act (OGTCA). Under the OGTCA, political subdivisions, such as the City, are liable for acts or omissions of employees who act within the scope of employment, but "shall *not* be liable ... for any act or omission of an employee acting outside the scope of the employee's employment." *Okla. Stat.* tit. 51, § 153(A) (emphasis added). "'Scope of employment' means performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a

---

[3] Contrary to the arguments asserted by the City and Palmer, § 1985 does not provide the only possible civil rights claim premised upon a conspiracy. A conspiracy may support a § 1983 claim, and such a claim does *not* require racial or class-based animus. *Dixon v. City of Lawton*, 898 F.2d 1443, n.6 (10th Cir. 1990) (explaining differences between conspiracy claims under § 1983 and § 1985). The parties' arguments relating to the conspiracy allegations of the First Amended Complaint are limited to § 1985, and the City and Palmer do not suggest a separate basis to dismiss plaintiff's § 1983 claim merely because he generally alleges a conspiracy.

competent authority...." *Okla. Stat.* tit. 51, § 152(12). The doctrine of *respondeat superior* is applicable under the OGTCA. *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1163 (Okla. 2009). Under that doctrine, "one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business." *Id.*

The City asserts that it cannot be liable for tortious conduct of defendant Henderson, because the acts alleged by plaintiff are entirely inconsistent with "acting in good faith" within the meaning of the OGTCA. As plaintiff notes, the Oklahoma Supreme Court has determined that even illegal conduct or abuse of lawful power by an officer may qualify as acts within the scope of employment. An act by a government employee is within the scope of employment "if it is done, however ill-advisedly, with a view to further the employer's interest or arises out of an emotional response to actions being taken for the employer." *Id.* at 1166. "[A]n employing subdivision is immune as a matter of law only if an officer's acts are so extreme as to constitute a clearly unlawful usurpation of authority the officer does not rightfully possess." *Id.* at 1167 (discussing *Decorte v. Robinson*, 969 P.2d 358 (Okla. 1998)). "An officer's illegal misconduct may be accomplished through an abuse of power lawfully vested in the officer, instead of by an unlawful usurpation of power the officer did not rightfully possess." *Id.*

Plaintiff cites *DeCorte* as support for the maintenance of his OGTCA claim against the City. In *DeCorte*, the Oklahoma Supreme Court determined that conduct could be found by a jury to have been "within the scope of employment" where an off-duty police officer engaged plaintiff in a traffic stop, assisted in plaintiff's arrest, and struck the plaintiff after he was handcuffed and placed in another officer's car. The off-duty officer was driving his own personal car when he began following and then pursued the plaintiff's vehicle at high speeds,

sometimes driving onto the center median. The officer then drew a handgun, pointed it at the plaintiff, pulled the plaintiff from his vehicle, attempted to subdue him with a carotid chokehold, assisted an on-duty officer in arresting the plaintiff, and then allegedly struck plaintiff and grabbed him by the throat while he was handcuffed and seated in the police car. *See* 969 P.2d at 359-60. The jury awarded a $30,000 verdict against the city, a verdict of $3000, plus $1,000 in punitive damages, against the officer, and made a special finding that the off-duty officer was acting in the scope of his employment as a police officer. *Id.* at 360. The Oklahoma Court of Civil Appeals reversed the judgment, reasoning that the officer could not have been acting within the scope of his employment while at the same time acting in such a wanton manner as to warrant punitive damages. *Id.* The Oklahoma Supreme Court granted certiorari and determined that the damage awards were not necessarily inconsistent, because the jury could have found that the officer's actions were within the scope of employment up to a point in time, so as to support the verdict against the City, but that "at some time during the episode [the officer] went beyond the bounds of good faith," such that an award of punitive damages against the officer was warranted. *Id.* at 362; *see also Nail v. City of Henryetta*, 911 P.2d 914, 917 (Okla. 1996).

The conduct alleged here is of a type that is, by its very nature, not taken in good faith, and is "so extreme as to constitute a clearly unlawful usurpation of authority [Henderson did] not rightfully possess." *Tuffy's*, 212 P.3d at 1167; *see State ex rel. Cameron Univ.*, 63 P.3d 535, 537 (Okla. 2003) ("An act of the employee is not in the scope of employment if the employee acted maliciously or in bad faith."). Plaintiff alleges that Henderson's affidavit, which was used to obtain the search warrant for plaintiff's house, "was a complete sham, fabrication, and was without any basis in fact or truth," and that Henderson "illegally and unlawfully entered [plaintiff's] residence; illegally and unlawfully searched his home and property; illegally and

13

unlawfully took possession of his personal property; illegally and unlawfully arrested and jailed him, [and] illegally and unlawfully caused a federal criminal indictment to be brought against him." (Doc. 13 at ¶¶ 14, 21). Plaintiff also cites parts of an indictment against Henderson for allegations of criminal conduct related to Henderson's actions with plaintiff and others. (*Id.* at ¶ 30). Plaintiff expressly alleges that Henderson's conduct was "intentional" and "extreme and outrageous." (Doc. 13 at ¶ 54). It is hard to fathom how a police officer could be acting in "good faith" when he knowingly provides an affidavit that is a "complete sham, fabrication, and was without any basis in fact or truth," leading to an "illegal and unlawful" entry, search, seizure, indictment, and incarceration. Doc. 13 at ¶¶ 14, 21).

Also, unlike the assertions in *DeCorte* and *Nail*, plaintiff's allegations do not include assertions of conduct by Henderson that was *initially* in good faith but which later crossed over to "beyond the bounds of good faith." *See DeCorte*, 969 P.2d at 362; *Nail*, 911 P.2d at 917. Henderson's alleged conduct was also not simply "incident to some service being performed for the employer" and was not of the type that "arises out of an emotional response to actions being taken for the employer," as in *Nail*, as the allegations of the Complaint indicate that Henderson presented an affidavit that was a complete sham and fabrication. *See* 911 P.2d at 918. There is nothing done by Henderson, according to plaintiff, that could be construed as within the bounds of good faith. Accordingly, the part of plaintiff's OGTCA claim against the City that is based upon *respondeat superior* liability for Henderson's conduct will be dismissed.

    2.    **Negligent Supervision**

Plaintiff's negligence claim under the OGTCA also asserts a direct claim for liability against the City for its alleged breaches of "common law and statutory duties to protect persons such as the Plaintiff from police misconduct...." (Doc. 13 at ¶ 50). Plaintiff further alleges that

14

the City had breached its duties to train, supervise, monitor and discipline TPD ... officers such as Henderson ..., including termination, once it became known of [sic] the obvious signs of misconduct by Henderson...." (*Id.* at ¶ 51).

The City contends that the direct negligence claim is barred by *Okla. Stat.* tit. 51, § 155(4), which provides exemption from tort claim liability where the "claim results from ... [a]doption or enforcement of or failure to adopt or enforce a law, whether valid or invalid, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy." The City also asserts that it is exempt under § 155(5), which provides an exemption from liability for claims arising out of "[p]erformance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees." *Id.*, § 155(5).

Plaintiff argues that Oklahoma law does not apply the exemptions to bar all claims regarding daily implementation of policy. In *Oklahoma Dep't of Public Safety v. Gurich*, 238 P.3d 1, 34 (Okla. 2010), the court noted that the exemptions under § 155(4), (5) "do not apply to tortious acts of government servants in the daily implementation of policy." Thus, the state and its political subdivisions enjoy immunity for the formulation of law and policy, but *not* for daily implementation of policy or planning level decisions. *Id.* This distinction between formulation of policy, which is discretionary and exempt, and acts which are operational and thus not exempt, is discussed with examples in *Teeter v. City of Edmond*, 85 P.3d 817 (Okla. 2004). A decision to build a parking lot is a policy decision that is a discretionary act for which a city is immune, while the actual construction of the parking lot is operational and not subject to immunity. *See id.* (quoting *Robinson v. City of Bartlesville Bd. of Educ.*, 700 P.2d 1013, 1015-16 (Okla. 1985)). A decision to install a crosswalk is discretionary, while negligent maintenance

15

of the crosswalk is a "failure of performance which is not discretionary but operational" and a claim based on such negligent maintenance "is not barred by § 155(5)." *Teeter*, 85 P.3d at 821.

Based on the foregoing, the City's motion to dismiss the plaintiff's negligence claim for failure to supervise is denied. Plaintiff's factual allegations are not directed to the City's decision to provide general training to officers, which would be discretionary and thus exempt. Instead, plaintiff claims that the City had reason to know that Henderson and other officers were fabricating information and violating citizens' rights, but that the City failed to take appropriate steps to supervise Henderson and thereby negligently injured plaintiff. That allegation relates to actions or inactions of an operational nature, which are not exempt. Hence, at this point, plaintiff's allegations state a plausible claim for negligence against the City.

### G. *Qualified Immunity*

Palmer argues very generally that he is qualifiedly immune from suit. Government actors are "shielded from liability ... if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)); *see also Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014). Assertions of qualified immunity are more typically addressed at the summary judgment stage, although courts will consider such assertions at the dismissal stage. *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). Asserting a qualified immunity defense at the dismissal stage subjects the defendant raising it to a more challenging standard than would apply at the summary judgment stage. *Id.*; *Choate v. Lemmings*, 294 F. App'x 386, 390-91 (10th Cir. 2008) (unpublished).

Plaintiff alleges that Palmer "knew that Henderson and other TPD officers were committing perjury, suborning perjury, fabricating evidence, and initiating what would become

the malicious prosecution of the Plaintiff and numerous other persons" and "tacitly accept[ed] and encourage[d] a code of silence wherein police officers refuse to report other officers' misconduct, and encourage and/or fail to discipline officers who 'testilie' [sic] and fabricate evidence to initiate and continue the malicious prosecution of the Plaintiff and others." (Doc. 13 at ¶ 34). At the pleading stage, these allegations are sufficient to overcome Palmer's qualified immunity defense. Of course, Palmer is not foreclosed from raising qualified immunity at the summary judgment stage, when there has been an opportunity to more fully develop the record.

### H. *Intentional Infliction of Emotional Distress Claim*

Plaintiff's Fourth Cause of Action includes a claim against Palmer for intentional infliction of emotional distress. Palmer seeks dismissal of that claim, on two grounds. First, Palmer asserts that the factual allegations against him are so general that they fail to describe any outrageous or extreme conduct. As noted, plaintiff has alleged that Palmer knowingly permitted Henderson to continue to fabricate information for search warrant affidavits and violate citizens' constitutional rights, that Palmer's actions were both intentional and reckless, extreme and outrageous, and that plaintiff suffered severe emotional distress as a result. Those allegations state a plausible claim for intentional infliction of emotional distress at the pleading stage. *See Computer Publ'ns, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002) (to recover damages for intentional infliction of emotional distress, plaintiff must ultimately prove the defendant acted intentionally or recklessly, the defendant's conduct was extreme and outrageous, the conduct caused plaintiff emotional distress, which was severe).

However, the Court concludes that plaintiff's intentional infliction of emotional distress claim should be dismissed as time-barred. The statute of limitations for a claim of intentional infliction of emotional distress is two years. *Williams v. Lee Way Motor Freight, Inc.*, 688 P.2d

17

1294, 1297-98 (Okla. 1984). The underlying acts upon which plaintiff's claims are based occurred in March 2008, when the alleged fabrication of information occurred and when plaintiff was arrested on purportedly false statements. This suit was brought well over two years later, in 2012. Plaintiff does not cite any authority applying the discovery rule to the accrual of a claim for intentional infliction of emotional distress, but instead only argues generally that he was lied to and threatened in connection with accepting his plea agreement.

The discovery rule, if applicable to claims for intentional infliction of emotional distress, would not apply to the circumstances alleged here. Based upon the allegations of the First Amended Complaint, plaintiff certainly knew, at the time of his arrest and subsequent conviction in 2008, that he had been falsely accused and that the statements in the search warrant affidavit were false. He specifically asserts that Henderson's affidavit was a "complete sham, fabrication, and was without any basis in fact or truth," and plaintiff quotes the statements on the March 5, 2008 affidavit which plaintiff asserts were fabricated. (Doc. 13 at ¶¶ 11, 14). Based upon his knowledge in March 2008, he certainly was aware of the existence of facts giving rise to his claim for intentional infliction of emotional distress, but did not assert that claim until after the statute of limitations had expired. The plaintiff's claim for intentional infliction of emotional distress is therefore dismissed.

### IV. The City's Notice Regarding "John Doe" Defendants 1 through 40

The City filed a separate "Notice," requesting that the Court dismiss the 40 John Does listed in the First Amended Complaint or, in the alternative, that the plaintiff be ordered to show cause why such dismissal would not be appropriate. (Doc. 33, 34). Plaintiff did not file any response. The City notes that, since being released from prison in 2010 and filing this suit in 2012, plaintiff has not named any of the unidentified John Does 1 through 40, has not served any

such individuals, and that any effort at this point to identify them would be untimely. The Court agrees. Plaintiff has well exceeded the time for service and has not requested an extension of the 120 day period within which to serve any John Does. Plaintiff also did not respond to the City's request for dismissal of the John Does and thus has not shown any good cause for failure to timely serve or name any additional known defendants. The dismissal of those John Does is accordingly appropriate. *See* Fed. R. Civ. P. 4(m) (If a defendant is not served within 120 days after the complaint is filed, the court, on motion of a party, must dismiss without prejudice against that party or order that service be extended).

In addition, if the plaintiff were to attempt to amend his suit to provide the names of any persons he originally named as John Does, such an attempt would be untimely. As discussed above with respect to the dismissal motions by the City and Palmer, the plaintiff's claims are subject to a two year statute of limitations, which has now expired. The Tenth Circuit has held that a plaintiff's substitution of named defendants for original unknown John Does "amounts to adding a new party," such that the naming of those parties would not relate back to the original complaint. *Garrett v. Fleming*, 362 F.3d 692, 696 (10th Cir. 2004).

The City's request for dismissal of the John Does 1-40 from this action will be granted.

## V. Conclusion

The dismissal motions filed by the City (Doc. 14) and Palmer (Doc. 15) are hereby **granted in part and denied in part** as set forth herein. Plaintiff's Fourth Amendment claim against the City and Palmer under § 1983 for false arrest is dismissed as time-barred. The Fifth Amendment and Sixth Amendment claims asserted under § 1983 are dismissed. However, the § 1983 claim is not dismissed in its entirety, as plaintiff has stated a plausible claim for a due process violation under the Fourteenth Amendment. The plaintiff's negligence claim against the

City under the OGTCA, to the extent that it is based upon *respondeat superior* liability for Henderson's conduct, is dismissed. However, the negligence claim survives to the extent that it is based upon the City's alleged failure to supervise. At the pleading stage, the plaintiff's allegations are sufficient to withstand Palmer's assertion of qualified immunity. The plaintiff's claim against Palmer for intentional infliction of emotional distress is dismissed as time-barred. The dismissal motions are denied in all other respects.

With respect to the City's "Notice," the City's request that the Court dismiss John Does 1-40 from this action (Doc. 33) is **granted**, and the City's alternative request for an order to show cause (Doc. 34) is **moot**.

The parties shall file a Joint Status Report by **September 9, 2014**.

SO ORDERED this 26th day of August, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE